**EXPERT REPORT OF DR. DORA SCHRIRO**

**Lynnsey Christie Betz, Plaintiff, v. Edward Bearden, Vevia Sturm, John or Jane Doe #1, and John or Jane Doe #2, All named Individuals in their Individual Capacities, Defendants. Case 5:18-cv-06079-FJG.**

I.      WITNESS QUALIFICATIONS

I am a career public servant who has served as an executive-level administrator, policy maker, and homeland security advisor. Over the past 25 years, I have led two city and three state criminal justice agencies and was the first Director of a new civil enforcement office in the U.S. Department of Homeland Security.

Most recently, I served as the Commissioner of the Connecticut Department of Emergency Services and Public Protection encompassing six state agencies including the Connecticut State Police, Homeland Security and Emergency Management, and Scientific Services (the state's crime lab) from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My DHS security classification clearance was Top Secret.

I was the Commissioner of two city jail systems, the St. Louis City Division of Corrections, from 2001 to 2003, and the New York City Department of Correction from 2009 to 2014. I was also the Warden of the Medium Security Institution, St. Louis City, Missouri, from 1989 to 1993.

I was the Director of two state correctional systems, the Missouri Department of Corrections encompassing state prisons and probation and parole, from 1993 to 2001, and the Arizona Department of Corrections encompassing state prisons and parole, from 2003 to 2009. During my tenure as Director of the Arizona Department of Corrections, we were the first correctional system to be selected Winner of the Innovations in American Government awards program, for our prison-based reform, Parallel Universe, pre-release preparation in which all inmates participated from the first to the last day of their incarceration guided by norms and values mirroring those of the community. As Director of the Missouri Department of Corrections, I also served on the state's Sentencing Commission.

I was also Senior Advisor to Department of Homeland Security (DHS) Secretary Janet Napolitano on Detention and Removal, and the founding Director of the Immigration and Customs Enforcement Office of Detention Policy and Planning in 2009. My security classification clearance was Secret.

I was a member of the adjunct faculties of University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor School of Law from 2005 to 2008 and taught graduate-level Criminology and Correctional Law courses and led Sentencing Seminars.  Earlier in my career, I was Executive Director of the Bergen County N.J. Planned Parenthood affiliate in Hackensack, New Jersey. Among the services provided were medical care and counseling to victims of sexual assault.

I am knowledgeable about the case law and legislation specific to pretrial and sentenced populations, and to civil detainees, including the Prison Rape Elimination Act (PREA). I am also knowledgeable about the American Correction Association and ICE Performance-based National Detention Standards including PREA.  I also participated in the writing of the American Bar Association standards for correctional systems and for ICE immigration detention facilities.

I am also knowledgeable about the operation of criminal pretrial and sentenced correctional facilities, civil detention, and the individuals in the custody of both criminal and civil justice systems.

I have served as a Corrections expert to the California Department of Justice, Disability Rights California, the Hampton County, Massachusetts Sheriff's Department, and the American Civil Liberties Union. I am currently engaged by the California Department of Justice, St. Louis University School of Law, and the Southern Poverty Law Center.

A complete and correct professional vita, including a list of my publications over the last ten years, is attached as Appendix A.

II.     EDUCATION

Northeastern University, BA cum laude, 1972

University of Massachusetts-Boston, M.Ed., 1974

Columbia University, Ed.D., 1984

St. Louis University, JD, 2002

III.     RELATED CORRECTIONAL EXPERIENCE

Recent Publications

Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature, in The State of Criminal Justice, American Bar Association (2013)

Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective, in The State of Criminal Justice, American Bar Association (2012)

Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective, Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)

Is Good Time a Good Idea? Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)

Related Affiliations

Member, ABA Criminal Justice Standards Subcommittee and co-author, the ABA revised criminal justice standards for correctional facilities (2005 – 2008)

Recent, Related Recognition

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012

Hofstra University (Hempstead, New York) Presidential Medal, 2010

National Governors Association, Distinguished Service to State Government Award, 2006

Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999

## IV.    OTHER CASES

I testified recently as an expert by deposition in the matter of Endicott v. Hurley et al., No. 2:14-CV-107 DDN (E.D., N. Div.). I have not testified as an expert in any other case during the past four years.

## V.  COMPENSATION

My standard hourly rate is $250.

## VI.    ASSIGNMENT

I have been asked to provide a Statement of Opinions concerning certain conditions of confinement which Ms. Lynnsey Christie Betz (Ms. Betz), formerly an inmate assigned to the Chillicothe Correctional Center (CCC), a secure women's correctional facility in Chillicothe, Missouri, encountered as set forth in Lynnsey Betz v. Edward Bearden, Vevia Sturm, John or Jane Doe #1, and John or Jane Doe #2, Case 5:18-cv-06079-FJG. The conditions of confinement to which Ms. Betz was subjected as an inmate during her incarceration in the Missouri Department of Corrections (the Department) concern (1) both sexual harassment and sexual assault by Correction Officer I (CO) Edward Bearden, a state employee, and (2) the failure of the agents of the Department whose collective responsibility it was to ensure its compliance with federal law and Department policy including law and policy to prevent, detect, and respond to offender sexual abuse, sexual harassment, and retaliation.

The facts and data upon which I relied in preparing this Statement included Case 5:18-cv-06079-FJG, statements by Ms. Betz and CO Bearden, the MODOC Department Procedure Manual D1-8.13 Offender Sexual Abuse and Harassment, the MODOC Employee Handbook dated January 2018, the 2016 and 2019 CCC Prison Rape Elimination Act (PREA) Audits, the Department's 2010 – 2019 Annual PREA Reports, and the CCC PREA investigations of other inmates, Karen Backhues Keil, Ashley Olsen Zieser, T.D., and N.G., of repeated sexual harassment and sexual assaults by CO Bearden. I also referred to the Prisoner Rape Elimination Act Prisons and Jail Standards, National Standards to Prevent, Detect, and Respond to Prison Rape under the Prison Rape Elimination Act (PREA) 28 C.F.R. Part 115, Docket No. OAG-131, RIN 1105-AB34 (U.S. Department of Justice, May 1, 2012); A National Protocol for Sexual Assault Medical Forensic Examinations Adults/Adolescents, Second Edition (U.S. Department of Justice, Office on Violence Against Women, April 2013); National Best Practices for Sexual Assault Kits: A Multidisciplinary Approach (U.S. Department of Justice, National Institute of Justice, 2017); Form SSV-2, Survey of Sexual Victimization, State Prison Systems Summary Form (U.S. Department of Justice, 2017), and the American Correctional Association Adult Correctional Institution Standards, 5th Edition.

**OPINIONS**

I.  Lynnsey Christie Betz's reporting of staff-on-inmate sexual abuse by CO Edward Bearden during her incarceration at the Chillicothe Correctional Center is supported by the facts.

II. CO Edward Bearden had the means and opportunity to repeatedly sexually assault and harass Ms. Betz and he caused her to suffer physical and emotional injury.

III. The Missouri Department of Corrections failed to provide the protection owed Ms. Betz throughout her incarceration.

IV. The failure of Missouri Department of Corrections and its agents to assess and act upon the complaints of inmates in its custody, contributed to the increase in substantiated staff sexual misconduct and staff sexual harassment and caused additional offenders to suffer needlessly.

I. **Lynnsey Christie Betz's reporting of staff-on-inmate sexual abuse by CO Edward Bearden during her incarceration at the Chillicothe Correctional Center is supported by the facts.**

A. There are two forms of Staff-on-Inmate Sexual Abuse. They are Staff Sexual Misconduct and Staff Sexual Harassment. Staff Sexual Misconduct is any behavior or act of a sexual nature directed toward an inmate by an employee, volunteer or contractor, official visitor or other agency representative, whether consensual or non-consensual and including intentional touching unrelated to official duties; or with the intent to abuse, arouse, or gratify sexual desire, or completed, attempted, threatened, or requested sexual acts; or indecent exposure, invasion of privacy, or voyeurism or sexual gratification. Staff Sexual Harassment is repeated verbal comments or gestures of a sexual nature to an inmate by an employee, volunteer or contractor, official visitor or other agency representative including demeaning references to gender, or sexually suggestive or derogatory comments about body or clothing; or repeated profane or obscene language or gestures. See Form SSV-2, Survey of Sexual Victimization, State Prison Systems Summary Form (U.S. Department of Justice, 2017).

B. Ms. Betz was sexually harassed and sexually assaulted repeatedly by CO Edward Bearden, a utility officer assigned to the Chillicothe Correctional Center, in the spring of 2016 during her incarceration at the facility. CO Bearden's unwanted contact with Ms. Betz occurred during his temporary assignment to cover a roving post in the vocational tech department. Ms. Betz's inmate work assignment was in that building.

First, CO Bearden sexually harassed Ms. Betz, repeatedly making unwanted verbal comments of a sexually suggestive nature. Later, as Ms. Betz attempted to pass through a doorway to an office in the vocational tech building where CO Bearden was standing, he blocked her path sufficiently so that she had to turn to her side to pass him without contact at which time, he reached out and grabbed her crotch. His conduct shocked and upset her. His sexual abuse of Ms. Betz was witnessed by another inmate. Ms. Betz asked the inmate who witnessed her assault to stay with her whenever possible to deter him. The very next day, when Ms. Betz went to a supply closet in the vocational tech department to fill a mop bucket, CO Bearden followed her into the closet, put his hand over her mouth, kissed her against her will. He forcefully pushed her against a wall in the closet causing her to strike her head on the wall then, tried to pull down her pants and underwear. A struggle ensued. Before she could break free, CO Bearden succeeded in placing his hands inside her pants and under her underwear. He penetrated her vagina with his fingers causing her to bleed and experience pain.

C. Ms. Betz did not report the sexual harassment and sexual misconduct abuse that she sustained by CO Bearden to authorities during her incarceration at CCC. She feared that if she did, she would be "written up" and put in "the hole," which is to say she would be reassigned to administrative segregation, and as a result, lose both her visits with her daughter who was just entering school at the time and her work assignment once that occurred. She had, however, asked the inmate who had witnessed her sexual assault the day before to stay with her whenever possible. She did everything that she believed she could do to protect herself.

D. Ms. Betz was admitted to the Department in October 2014 and released on July 31, 2016. On June 5, 2018, Ms. Betz filed Case 5:18-cv-06079-FJG in the U.S. District Court for the Western District of Missouri. Ms. Betz came forward to report CO Bearden's sexual harassment and sexual misconduct of her, and to prevent future harm to other women incarcerated at CCC.

E. Ms. Betz was not the only inmate at CCC who CO Bearden sexually harassed and assaulted. CO Bearden was also accused of sexually abusing Ms. Keil, Ms. Zieser, T.D., and N.G.

F. Karen Backhues Keil was admitted to the Department on June 12, 2011 and released on parole on February 1, 2017.  In the course of a facility investigation of the sexual abuse of another inmate at CCC, Ms. Keil was interviewed by PREA Investigator Bentley on January 18, 2018, during which, she disclosed under oath, that she had been sexually abused repeatedly by both CO Bearden and LPC Dunn, a contract health care employee. MDOC 001696.

G. On May 29, 2018, Ms. Keil filed Case 5:18-cv-06074-BP in the U.S. District Court for the Western District of Missouri.

H. Since Ms. Keil, and Ms. Betz filed their Complaints with the Court, three additional women, previously or currently incarcerated at CCC, came forward or were brought forward, also victims of sexual abuse by CO Bearden.

   1. Ashley Marie Olsen Zieser was admitted to the Department in 2013 and released on parole on May 10, 2017. Ms. Zieser was sexually abused by CO Bearden in 2015 and 2016.  MDOC 001735.

      On July 2, 2018, Ms. Zieser filed Case 5:18-cv-06103-FJG in the U.S. District Court for the Western District of Missouri.

   2. T.D., still incarcerated at CCC at the time of reporting, was sexually abused by CO Bearden, dates not initially known. CCC Institutional Investigator York discovered her abuse on July 12, 2018, while monitoring inmate phones.  MDOC 001708 ff.

   3. N.G., still incarcerated at CCC at the time of reporting, was sexually abused by CO Bearden between September and November 2017.  Her sexual abuse was reported on July 20, 2018, by her fiancé. MDOC 001717 ff.

II. **CO Edward Bearden had the means and opportunity to repeatedly sexually assault and harass Ms. Betz and he caused her to suffer physical and emotional injury.**

A. Every inmate must follow the order of any correction officer. Any correction officer can write-up any inmate for failure to follow their order. The word of the correction officer is presumed to be true, and that of the inmate, untrue. Inmates are also "written-up" by officers for making statements believed to be false. The write-up can result in the loss of privileges such as special visits with their children, otherwise known in the Department as Parents and Their Children, or PATCH, for which they must continuously qualify by maintaining good institutional conduct, as well as their institutional work assignment. It can also result in reassignment to administrative segregation and impact their release date.

No good comes to the offender from any of these consequences. First, typically female offenders receive far fewer visits than do male inmates. Women are more likely to visit their male partners in prison and bring their children to see them than are women likely to see their male partners or their children while incarcerated. The PATCH program was established in part to help overcome this disparity so that the moms could maintain their relationships with their children and be more successful as parents upon reentry. That is also why I introduced Girl Scouts Behind Bars for female offenders and their daughters during my tenure.

Second, women are also less likely to have anyone "put money on their book;" that is, deposit funds to their commissary account in order to make any purposes while in prison. To lose one's job in prison, is to become both indigent and idle, each condition debilitating and demoralizing.

Third, the write-up can result in reassignment to administrative segregation, restrictive housing that serves three purposes, none of which is desirable. They are (1) to temporarily separate one or more inmates from others by means of restricted movement pending completion of the investigation which per policy, may take as long as 70 days, and longer with an extension, (2) a disciplinary reassignment of relatively short duration usually not to exceed 30 days, to punish the offender for filing a false report or voluntarily engaging in sexual misconduct as examples, or (3) protective custody of indefinite duration. Whether the intent is to protect or to punish overall, offenders experience all assignments to segregation as punitive because their movement is limited, the number of hours they are locked down daily is significant, and all their privileges including outdoor recreation with other inmates, work assignment, contact visits, phone calls, and commissary are usually forfeited. In sum, whether a victim of sexual abuse is assigned to the "hole" pending the outcome of the investigation of her allegation presumably for her own protection, or longer because she is deemed no longer safe to remain in general population and now requires protective custody, or was found to have violated one or more facility rules and is now subject to punishment, the effect of the threat of a write-up on reporting staff-on-inmate sexual abuse is chilling. It is my opinion; the Department must put in place viable alternatives to administrative and disciplinary segregation to achieve a better result.

When CO Bearden subjected Ms. Betz first to repeated verbal abuse concerning her appearance and then, to repeated sexual assault, criminal acts and violations of her Eighth Amendment rights, she believed her only course of action was to ask another inmate to stay nearby as a deterrent and otherwise, to remain silent.

B. CO Bearden demonstrated heightened awareness of the facility's security cameras locations. When Bearden sexually abused Ms. Betz first in a corridor and then in a nearby supply closet in the vocational tech building at CCC, he knew he could not be captured on a security camera as there was none in either area. Likewise, when Bearden sexually abused Ms. Keil in a nearby property room at CCC, and she told him that he would be caught by the security camera if he did not stop, he responded that the cameras did not cover that area. MDOC 030420. And, when Bearden sexually abused N.G.., an offender assigned to the barbershop, while she cut his hair, she also told him to stop or he would be caught on camera. He rebuffed her admonition as well, telling her he could not be seen from the barber's chair where he was sitting and while he was wearing a barber's cape. MDOC 001717 ff.

C. Upon graduating from the Academy, CO Bearden was assigned to and remained at the CCC, and much of that time he worked as a Utility Officer; that is, an officer who is dispatched to various assignments in the course of a shift and over time, often to backfill an absent officer or a vacant post. Given the inherent mobility of these assignments, direct supervision of utility officers by superior officers is limited; more so due to the facility's chronically low staffing levels. He knew it well and used that information to his advantage.

D. It is my opinion CO Bearden demonstrated the predatory behaviors of a sex offender. He appeared to select individuals who would be reluctant to report him, women fearful of losing PATCH visits with their children, their work assignment, or a forthcoming parole date, women of low self-esteem, women who had been previously sexually abused, women who had a lot of time to serve, or women with young children waiting at home – women like Ms. Betz.  His conduct as aggressive as it was, was also controlled; he appeared to be careful even as he grew more forceful in his assaults so as to continue to avoid being discovered and reported. When Bearden sexually assaulted Ms. Betz in the corridor, and she returned to work the next day, he immediately attempted to rape her in the supply closet. He conducted himself in a similar manner with Ms. Keil. The day after he raped her, an assault during which she sustained bruising; he came back the next day to assess her state of mind and physical injuries. When there were no apparent consequences, his aggression towards her escalated. Upon information and belief, Bearden's abuse of Ms. Betz was ended only due to a fortuitous reassignment to another temporary post in another part of the facility.

E. At no time, did the Department take substantive action to protect Ms. Betz.

**III.** **The Missouri Department of Corrections failed to provide the protection owed Ms. Betz during her incarceration.**

A. The Department is responsible for the care, custody and control of all the inmates in its custody. It can never delegate its statutory duty to ensure the safety and well-being of all the offenders in its custody and under its control. Its duty of care owed to every inmate includes freedom from all forms of sexual abuse and sexual harassment. 28 CFR Part 115, Prison Rape Elimination Act National Standards.

To this end, the Department issued a written policy mandating zero tolerance toward all forms of sexual abuse and sexual harassment and outlining its approach to preventing, detecting, and responding to such conduct. Department Procedure Manual D1-8.13 Offender Sexual Abuse and Harassment.

Department Procedure D1-8.13, Offender Sexual Abuse and Harassment, is the Department's policy establishing zero tolerance for offender sexual abuse and harassment and delineating its strategies and responses to reduce and prevent offender sexual abuse and harassment. Its effort is led by the Department's PREA Manager selected and supervised by the Department Director with the help of a PREA site coordinator at the level of deputy warden or higher at each facility designated by the Director of Adult Institutions. III. Procedures, A. General Information, 4. and 6.a. There are also ten PREA investigators, several of whom are assigned to the CCC. It is my opinion, the Department failed to implement 28 CFR Part 115, Prison Rape Elimination Act National Standards, in a manner that provided the protection owed Ms. Betz and other offenders during their incarceration.

Key to the commitment that the Department prevent, detect and respond to all forms of staff-on-inmate sexual abuse are the following.

1. Personnel Selection, Training, and Retention. Department policy requires all paid, unpaid and contract employees undergo a background and records check. Only applicants with convictions must not be offered employment. D1-8.13 III. Procedures, B. Human Resources, 1. a-c.

   a. CO Bearden worked previously for the State of Missouri at the Department of Transportation as a crew leader from 1983 to 2001. He was involuntarily terminated following an incident of sexual harassment of a female co-worker. See Form MO 931-1419 (1-08), D. Employment Record.

   Nonetheless, the Department hired Bearden as a Correction Officer in 2009. Over the next nine years, he attended a patchwork of classes about offender sexual abuse including Working with the Female Offender, Staff and Offender Relations ("It Could Never Happen to Me"), Anatomy of a Set-Up, and PREA refresher training, between two and eight hours each in duration. MDOC 000628 – 000639. His annual performance ratings were average, with "knowledge of work" beginning his first year of employment with a score of 4 of out 10 and ending his last year of employment with a score of 6 out of 10. Similarly, "quality of work" beginning his first year of employment earned a score of 5 out of 10 and ending his last year of employment, with a score of 7 out of 10. And

still, Bearden also served as a Field Training Officer for probationary uniformed personnel at CCC.  MDOC 030255.

Bearden was investigated six times for staff-on-inmate sexual abuse between February 2014 and July 2018. The first investigation concerned off-duty conduct determined not to involve criminal activity. The second, concerning Ms. Keil, resulted in unsubstantiated sexual allegations due to the time between the events and their reporting. The remaining four investigations, all of them also concerning his sexual abuse of offenders, including that of Ms. Betz, were open and ongoing when he retired September 1, 2018.

    b.  The Department employed CO Bearden despite his questionable employment history. He completed the training provided, limited as it was, receiving below average to average scores, and average performance evaluations during his tenure. He engaged repeatedly in unlawful sexual misconduct with female offenders in his care and under his control during his tenure at the Department, conduct that warranted closer consideration and definitive corrective action, neither of which was not given.

2. Staffing Levels and Video Monitoring. Department policy requires there shall be sufficient uniformed line staff and supervisors to conduct scheduled and unscheduled security rounds to monitor staff and offender activity to prevent, detect, and respond to offender sexual abuse. See D1-8.13 III Procedures, A. General Information, 11. The PREA Standards upon which Department policy is based, also require there are sufficient recording video cameras. See §115.13.c.2. Supervision and Monitoring. Sufficiency is a function of facility capacity, its census, and the population's assessed needs and risks.

The CCC designed capacity is 1,636 adult female offenders encompassing all custody classification levels. The facility consists of both general population and administrative segregation housing, medical, mental health, and substance abuse units, and central services and programs services, as well as an administration building, state garage and powerhouse. There are 14 buildings on the 55-acre fenced campus. The most recent census information available is a one-day snapshot from June 2019 at which time, there were 1,425 adult female offenders and 307 security staff, presumably encompassing all ranks from the Superintendent to Correction Officer.  See 2019 CCC PREA Audit, p. 4.

    a.  Department policy requires the staffing plan consider blind spots and areas where staff or offenders may be isolated, the composition of the offender population, and the prevalence of substantiated and unsubstantiated offender sexual abuse allegations when considering its sufficiency. See D1-8.13, III Procedures, A. General Information, 11. The policy also requires the facility comply with its staffing plan, document staffing deviations, and provide justification for deviations in staffing. See D1-8.13, III. Procedures, A. General Information, 12.  It also requires the facility ensure sworn staff in the classification of lieutenant or above conducts and documents unscheduled and unannounced rounds to identify and deter offender sexual abuse. See D1-8.13, III. Procedures, A. General Information, 13.

b. The typical correctional facility, a male facility consisting of various custody classification levels, dormitory and cell housing, and general and special populations, has, on average, 1 officer: 5.1 inmates; otherwise known as the inmate to total officer/sworn supervisor ratio. See ASCA Staff: Inmate Ratio Survey at Newshttps://www.prisonlegalnews.org/media/publications/ASCA%20Responses%20Staff%20to%20Inmate%20Ratio%20Survey,%20Association%20of%20State%20Correctional%20Administrators,%202010.pdf.

A women's prison is not the typical correctional facility. however. Staffing studies have shown the needs and nature of interactions of female offenders and sworn personnel differ from the interactions of their male counterparts. Among the security staffing issues associated with a women's correctional facility is the demand for additional security staff to transport female offenders to and from off-site health care facilities, and to escort them to and from on-site medical, mental health, and program services. The roles and responsibilities of security staff in women's facilities also differ from those in men's facilities, increasing security staff's workload in a women's facility. These additional duties include monitoring their physical and mental health and pregnancies and addressing their individual concerns vis a vis personalized attention. Traditional security-related tasks, such as searching, and supervising female offenders also tend to take longer, more so when male officers are assigned as their interactions activate cross-gender provisions for offender supervision. Also, of note when staffing a women's correctional facility is how male officers are deployed. Although most agencies have special provisions in their policies for cross-gender staffing and/or posts, few require a specific ratio of male officers to female offenders to accommodate those time-on-task differences. Prison Staffing Analysis: A Training Manual with Staffing Considerations for Special Populations, U.S. DOJ National Institute of Corrections, 2008.

Staffing inequities manifest in troublesome ways. For example, the Department requires staff of one gender to announce themselves upon entering the housing unit where offenders of the other gender are housed. It also prohibits cross-gender viewing. It is noteworthy that in 2016, a PREA auditor determined cross-gender viewing was occurring during security checks in CCC's segregation and crisis level units but did not recommend or require any modifications to either the physical plant or agency policy, nor did MODOC self-initiate. 2016 CCC PREA Audit Report, p. 2. It is also well documented that CO Bearden moved freely through women's housing units including the shower areas without being announced or challenged.

c. In 2019, the Department reported CCC used 449 video cameras to surveil the facility's 14 buildings and grounds. This number is not as large as it may appear. The facility includes four general population dormitories with 38 multiple occupancy, multi-story housing units and a 58-cell administrative segregation housing unit plus medical, mental health and substance abuse units, support, program, visitation and administrative areas, the powerhouse and state garage, each of which has its own combination of wings, corridors, storage closets, breakrooms, restrooms and stairwells. 2019 PREA Audit

Report, p. 3. Bearden leveraged to his advantage, the areas in the facility that had no or inoperable cameras.

In 2015, the Department reported additional video cameras had been requested to enhance video monitoring.  2014 PREA Annual Report, p. 4.  A subsequent memo from Physical Plant Supervisor III Coffman to CCC PREA Investigator II Pfeifer confirmed, "The facility has not added any additional cameras to the general population housing units since its construction in 2008. The laundry room cameras are original equipment."

d.  Monitoring offender phone conversations and mail are two other means by which correctional facilities identify and investigate serious violations of department rules and unlawful conduct. CCC had insufficient resources to perform these functions and maximize their utility.

In 2014, an investigator discovered CO Bearden had engaged in off duty conduct with a former female offender while randomly monitoring phone conversations and recommended that the matter be referred to AIO. No information was provided to indicate whether this recommendation was acted on, or its outcome. In 2018, Ms. Keil reported in her deposition that CO Bearden had directed her to memorize his phone number because he wanted her to call him after she was released.

In 2018, an institutional investigator discovered while monitoring offender phone calls that Bearden has sexually abused another female offender at CCC, and he opened an investigation that was substantiated.

As more victims of sexual assault by Bearden were identified, a WERDCC PREA investigator requested additional resources from his supervisor on July 3, 2018, to find and follow leads by means of monitoring more recorded conversations. [

Ms. Keil also reported in her interview that CO I Bearden had mailed a card to her at the facility while she was still incarcerated. It was not intercepted in the Mail Room or by the staff member who delivered it to her, or by correction officers during subsequent institutional searches.

e.  The most reliable measure of sufficiency is the outcome; specifically, whether female offenders come forward to report abuse, investigations are objective, thorough and timely, and offender sexual abuse rises, falls, or remains constant. Based upon the available information, which is limited, female offenders at CCC continue to suffer sexual abuse by state employees and contract staff.  During the most recent 12-month PREA reporting period, the facility recorded 186 PREA allegations including 93 allegations involving sexual contact by state or contract employees or offenders and 93 allegations involving sexual harassment by state or contract employees or offenders. 2017 CCC  PREA Report, pp. 5 – 6.

i. Sexual Contact. There are three types of sexual contact. They are inmate-on-inmate nonconsensual sexual acts and abusive sexual contact, and staff-on-inmate staff sexual misconduct. U.S. DOJ Survey of Sexual Victimization Form SSV-2 (9-25-2018). The 2019 PREA Audit Report noted 93 allegations of sexual contact (50%) of which, 60 were inmate-on-inmate and 33 were staff-on-inmate. Of the 60 inmate-on-inmate allegations, six were substantiated, ten unsubstantiated, 32 unfounded, and 12 investigations not completed. Of the 33 staff-on-inmate allegations, three were unsubstantiated, 14 unfounded, and 16 investigations not completed.

ii. Sexual Harassment. There are two types of sexual harassment. They are inmate-on-inmate sexual harassment and staff-on-inmate sexual harassment. U.S. DOJ Survey of Sexual Victimization Form SSV-2 (9-25-2018). The 2019 PREA Audit Report also noted 93 PREA allegations of sexual harassment (50%) of which, 78 were offender-on-offender and 15 were staff-on-offender. Of the 78 inmate-on-inmate allegations, 13 were substantiated, 36 were unsubstantiated, 26 unfounded, and three investigations not yet completed. Of the 15 staff-on-inmate allegations, one was substantiated, four were unsubstantiated, eight 8 unfounded, and two investigations not yet completed.

iii. Outcomes. Over one-third, 33 of 93 sexual contact allegations, involved staff whereas 78 of 93 sexual harassment allegations, almost 85 percent, involved inmates only. When staff was involved in offender sexual abuse, most often it involved sexual contact including penetration.

Almost one-third, 28 of 93 investigations of allegations of offender sexual abuse (30%), were not yet completed whereas most allegations of sexual harassment, 88 of 93 (95%) had been completed.

Fewer than one-third, 53 of all 186 allegations (28.5%), were unsubstantiated; fewer than one half, 90 of 186 (48%), was unfounded.

iv. Analysis. It is my opinion there are insufficient security staff, investigators, video monitoring, and supervisory oversight to prevent, detect, and respond to offender sexual abuse at CCC. I believe the Department should allocate more resources to, and place greater emphasis on, preventing, detecting, and responding to offender sexual abuse allegations sooner. Specifically, the Department should increase security rounds by correction officers and unannounced security checks by supervisors in the rank of lieutenant and above at CCC as well as adopt male: female staffing ratios for CCC. It should also increase routine monitoring of offender phone calls and mail by facility investigators and add or reallocate PREA investigators to complete investigations of PREA allegations timely. Additionally, the Department should add more video cameras and consider increasing video retention beyond 30 days. Earlier identification and investigation, and modification of policy and practice concerning its use of segregation housing will also encourage more victims of sexual abuse and witnesses to come forward and lower the numbers of unsubstantiated and unfounded allegations.

3. Practice the Zero Tolerance Policy. Department policy states it has a zero tolerance for all forms of offender sexual abuse, harassment, and retaliation however, its protocols and practices impede its realization. D1-8.13 Offender Sexual Abuse and Harassment, I. Purpose.

   a. Offenders' Vulnerability for Sexual Assault by State, Contract, and Unpaid Employees is not assessed. Department policy requires an assessment of all offenders at intake and periodically thereafter for victimization of, and by, other offenders, but not victimization by state, contract, and unpaid employees. While the policy recognizes members of the workforce may sexually abuse offenders, as a practice, clearly the Department is unwilling to do so. III. Procedures. C. Reception and Orientation. 1, 1.a., b., and c., and 3a.

   b. Reporting Sexual Abuse. Department policy makes provision for more than one way to report sexual abuse including anonymously, by means of informal resolution, the formal grievance process, to a staff member, the PREA hotline, an advocacy agency, or the Department of Public Safety, Crime Victims Services Unit. D1-8.13, III. Procedures. F. Reporting Sexual Abuse or Harassment, 1. a. - d., 2. a. - b., and 3. The policy specifically states it will not require an offender to use the grievance process, to resolve alleged incidents of sexual abuse. Yet, CCC Warden McBee's Affidavit as well as several other administrators' Affidavits call out by name female offenders who had been subjected to sexual abuse and had not filed or followed the grievance procedure. Their affidavits suggest a lack of familiarity with or an understanding of the policy. D1-8.13, III. Procedures. F. Reporting Sexual Abuse or Harassment, 8. a. (1) and (2).

   c. Administrative Segregated Housing. Department policy provides both temporary administrative segregation confinement (TASC) and indefinite administrative segregation housing may be used in the course of a PREA investigation (i) temporarily, to protect the victim, witness, and/or another offender assisting the victim, pending the outcome of an investigation, because the protective custody assignment is sometimes involuntary, it should not exceed 30 days; (ii) indefinitely, to protect the victim, witness, and/or another offender assisting the victim, following the outcome of an investigation; and (iii) for a specified term, as punishment for the victim, witness, and/or another offender assisting the victim, found to be intentionally lying in the course of sexual abuse investigations. D1-8.13, III. Procedures, H. Segregated Housing in Institutional Setting. And, when the assignment to administrative segregated housing is (iv) involuntary, ordinarily it should not exceed 30 days. D1-8.13, III., H. 5.

   Because the Department commits it will employ the least restrictive means when it determines an offender is at high risk of victimization, segregated housing should be used as its last, and not its first course of action. Less restrictive means include temporary reassignment of staff members. D1-8.13, III. Procedures, H. Segregated Housing in Institutional Setting, 1., 1.b.2. and 1.b.4., and 2.a., 3. The Department was slow to employ this option, however. Warden McBee called CO Bearden at home early

in June 2018 to ask whether he had any concerns about working inside the facility. Email, June 5, 2018, from the Warden to Deputy Warden Crews. On July 2, 2018, immediately following a press inquiry about the third lawsuit, McBee directed Bearden could only work a no-offender-contact post. Email, July 2, 2018, from Chris McBee to David Savage. Bearden was temporarily reassigned the next day, months after Ms. Keil had been interviewed by a Department investigator and weeks before he retired.

Department policy specifically stipulates TASC should not be considered as the first option to ensure the safety the victim, witness, and/or another offender assisting the victim, pending the outcome of an investigation, and sets a high threshold for punishing an offender who lies intentionally in the course of sexual abuse investigations – but it allows for both. It also provides when the offender is placed in segregated housing, her access to institutional services will be in accordance with procedures regarding segregation units – severely restricted. See D1-8.13 III. Procedures, H. Segregated Housing in Institutional Setting, 2 and 3, and N. PREA Offender Management Team, 1. The effect is chilling.  Many female offenders are certain if they come forward, they will be put in "the hole" for the entirety of the investigation during which time, they will also lose the privileges they enjoyed in general population. Their belief is informed by their own experiences, the threats made by their abusers who are members of staff, and the policy itself.

d.  Offender Concerns about Credibility. Many victims of sexual abuse are fearful they will not be believed should they come forward to report sexual abuse. This is true in the community and more so in prison, where female offenders also worry, they will be punished.

Department policy D1-8.13 establishes the PREA Offender Management Team which may be convened when an offender displays a pattern of behavior that includes three or more sexual abuse or sexual harassment investigations with findings of unfounded within specified timeframes. D1-8.13, III. Procedures, N. PREA Offender Management Team, 1.

Staff has also threatened to write-up inmates who were victims of, or witnesses to, staff sexual misconduct. CO Bearden threatened to write-up Ms. Keil if she reported his conduct jeopardizing her parole date, but he did not. MDOC 030420. LPC Dunn threatened to write-up another inmate he had abused, and he did. MDOC 025527. Unfortunately, staff mandated reporting can have the same untoward effect. Victims of sexual assault who come forward and are deemed credible, are also reassigned to segregated housing albeit for their own protection. The result, however, is still the same – indefinite, restricted movement and loss of privileges including PATCH visits.

4.  Impeded Access to Emergency Medical Treatment and Crisis Intervention Services. Department policy states victims of sexual abuse will receive timely, unobstructed access to

emergency medical treatment and crisis intervention services. D1-8.13, III. Procedures, I. Health Services Care, 1.

a. Department policy states in the event of an allegation of a penetration act, the first responder shall request the victim not take any actions that may destroy physical evidence including washing, brushing teeth, and changing clothes.

CO Bearden first sexually assaulted Ms. Betz in the corridor of the vocational tech building. The assault shocked and disturbed her. The next day, he sexually assaulted her in the supply closet. In the struggle to remove her clothes, she struck her head on the wall. When he digitally penetrated her, she bled and experienced vaginal pain. His status as a correction officer, and hers as an inmate as well as a sexual assault survivor, both undermined her credibility and impacted her ability to come forward to report him and so, to also preserve the physical evidence on her person and on his.

b. Department policy states when the alleged perpetrator is a staff member, the victim shall be transported to the community emergency room for a sexual assault examination.

CO Bearden's status and her traumatization prevented Ms. Betz from coming forward and receiving timely, unobstructed access to sexual assault examinations by a SANE or SAFE provider and other emergency medical treatment.

c. Department policy states victims of sexual abuse are also assured timely, unobstructed access to crisis intervention services.

CO Bearden's status and her traumatization further prevented Ms. Betz from receiving crisis intervention services.

5. Core Accountability. The Department failed to protect Ms. Betz. She suffered severe physical and emotional trauma due to all Defendants' actions and inaction.

a. CO Bearden was a correctional officer assigned to the Chillicothe Correctional Center within the Division of Adult Institutions.

CO Bearden was not discrete. He was open and obvious in his conduct. CO Bearden singled out Ms. Betz for sexually demeaning verbal attention in the vocational tech building, his place of work, and hers. He created a situation in the corridor where she had no choice but pass him sideways at which point, he reached out and placed his hand between her legs and groped her. Emboldened, he followed her into a supply closet where she was filling a bucket with water at the mop sink and attempted to rape her, first trying to remove her pants and underwear and ultimately after a struggle in which she struck her head on a wall, to penetrate her with his hand under her clothes. His

conduct should have attracted attention and redirection and an investigation by his supervisors, but it did not.

Similarly, only after the sexual assault of yet another female offender at CCC, was Ms. Keil contacted at home by the Department several years after her release from custody. In January 2018, in the course of her interview she disclosed her repeated sexual assaults by both a contract employee and CO Bearden. Only then did the Department appear to act as if it had received a credible information. Ms. Betz filed her Complaint in June 2018.

b. The Correctional Superintendent is Chillicothe Correctional Center's chief operating officer and facility administrator. The Correctional Superintendent's immediate supervisor is the Assistant Director for Adult Institutions.

c. There are three Assistant Directors for the Division of Adult Institutions, one for each of three zones, with each zone consisting of seven correctional facilities. The Assistant Directors' immediate supervisor is the Director of the Division of Adult Institutions.

d. The Director of the Division of Adult Institutions oversees the operation of the division's three zones encompassing 21 correctional facilities.

The Director of the Division of Adult Institutions selects the PREA Site Coordinator for each of the 21 correctional facilities. D1-8.13, III. Procedures, A. General Information, 6., 6.a.

e. The PREA Site Coordinator is a facility employee at the level of deputy warden/ associate superintendent or greater, someone who has sufficient time and authority to assume these duties. The PREA Site Coordinator is responsible for that facility's compliance with PREA standards. D1-8.13, II Definitions, V. PREA Site Coordinator.

f. The PREA Manager is responsible for the implementation and compliance of the Department's PREA policy and program. D1-8.13, II Definitions, S. PREA Manager.

g. The Department Director establishes department policy and procedure and secures the resources for its implementation. The Department Director is ultimately accountable for its activities and outcomes. The Director of the Division of Adult Institutions and the PREA Manager report directly to the Department Director.

6. Investigative Integrity and Organizational Transparency. Agencies and individuals in their employ make mistakes, errors in judgement, not integrity; administrative errors, not criminal violations. What distinguishes the better from the bad organization is how quickly and comprehensively the agency assesses and acts upon its assessments to prevent reoccurrences and improve outcomes.

Despite numerous, substantive complaints, CO Bearden remained in good standing throughout his employment at the Department. With one investigation of sexual abuse closed as unsubstantiated due to delay in reporting in combination with the uncertainty about the specific dates of the abuse, and four investigations of sexual abuse involving multiple offenders open and ongoing, he continued to work in the facility, with no limitations on offender contact, until July 2, 2018, when a reporter asked why he had not been removed. Only then he was reassigned, temporarily, to the control center, a non-contact post, but still within the secure perimeter. On his last day of work the facility administration gave him a party. He retired effective September 1, 2018, eligible for reemployment.

**IV. The failure of Missouri Department of Corrections and its agents to assess and act upon the complaints of inmates in its custody, contributed to the increase in substantiated staff sexual misconduct and staff sexual harassment and caused additional offenders to suffer needlessly.**

A.  Missouri was among the first states to report that it complied with PREA but that is not case. The PREA auditors found all the components of 28 C.F.R. Part 115 in place during both audits, in 2016 and 2019 and still, the Department repeatedly failed to follow the Procedure it promulgated to comply with federal regulation as identified in Sections I, II, and III.

B. Further, PREA sets out minimum standards to eliminate prison rape. An agency may need to do more reach and then sustain this goal. It is my opinion that the Department is such an agency. Defendants' PREA policy and procedures failed to prevent, detect, and respond to the repeated staff-on-inmate sexual abuse of Ms. Betz at the CCC by CO I Bearden as well as the sexual abuse of other offenders by state staff and contract employees during their incarceration in the Department.

Over one-third of all substantiated incidents of sexual abuse and sexual harassment in the past three reported years, 2015 – 2017, were inflicted by correctional personnel and contract employees. Moreover, the number of substantiated incidents of sexual abuse and sexual harassment by staff rose from 75 in 2015, to 83 in 2016, to 105 in 2017. Finally, the incidents of substantiated staff-on-offender sexual misconduct, the most serious form of unwanted and unlawful sexual offending, rose from 17% in 2015, to 24% in 2016, to 26.5% in 2017.

| MO Department of Corrections *Substantiated* Staff-on-Inmate Sexual Abuse* | | | | |
|---|---|---|---|---|
| Incident Type by Year: | 2015 | 2016 | 2017 | Total |
| **Inmate-on-Inmate, all substantiated complaints** | **49 (65%)** | **50 (60%)** | **68 (65%)** | **167  (63.5%)** |
| **Staff-on-Inmate, all substantiated complaints** | **26 (35%)** | **33 (40%)** | **37 (35%)** | **96  (36.5%)** |
| Staff Sexual Misconduct, all substantiated | 13 (17%) | 20 (24%) | 28 (26.5%) | 61  (23%) |
| Staff Sexual Harassment, all substantiated | 13 (17%) | 13 (16%) | 9 (8.5%) | 37  (13%) |
| **Totals** | **75** | **83** | **105** | **263 (100%)** |

* MODOC 2015 PREA Annual Report at https://doc.mo.gov/sites/doc/files/2018-01/2015_PREA_Data.pdf, MODOC 2016 PREA Annual Report at https://doc.mo.gov/sites/doc/files/2018-01/2016_PREA_Data.pdf, and MODOC 2017 PREA Annual Report at https://doc.mo.gov/sites/doc/files/media/pdf/2019/02/2017_PREA_Data.pdf

It is my opinion, Defendants failed to meet the duty of care owed Ms. Betz and other victims of offender sexual abuse during their incarceration as enumerated in the Prison Rape Elimination Act and promulgated by the Department as Department Procedure Manual, Policy D1-8.13, Offender Sexual Abuse and Harassment. As the data above indicates, the Department and its agents continue to fail to meet the duty of care owed all offenders since Ms. Betz's release from the state's custody.

I declare under penalty of perjury that the foregoing is true and correct.

*Jana B. Schmid*

December 6, 2019